UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 1:19-CR-09-HAB |
| ) | |
| TIMOTHY CANNON ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

"They got the wrong guy. They got the wrong guy and they know it…And the thing is guys, we have the person who did it." (Trial Tr. Day 1, ECF No. 149, at pp. 17-19). These initial remarks to the jury by Timothy Cannon's ("Cannon") defense counsel reflected Cannon's "it wasn't me" trial strategy on the gun and drug counts charged here. (Superseding Indictment, ECF No. 47). Counsel continued on and prophesied to the jury: "We know the person who did this deal…We're going to have him here as a witness. He's my client's brother, Terry Cannon, and he's going to testify that it was him…" (*Id.*). This was a risky approach, especially when reality collides with prophecy, as it did here. Rather than exonerating his brother, Terry Cannon (Terry), to defense counsel's apparent surprise, asserted his Fifth Amendment rights when defense counsel asked questions that might incriminate him in his brother's three charges. This hullabaloo resulted in a call for a mistrial by the Government and inquiry by the Court as to whether counsel knew his witness intended to "plead the fifth" before the jury. The Court denied the Government's motion for a mistrial (Trial Tr. Day 3, ECF No. 151, at p. 119) and sent the case to the jury. Cannon was convicted on all counts (ECF No. 88).

Soon after, defense counsel moved to withdraw (ECF No. 99) and the Court appointed substitute counsel for post-trial matters. Now before the Court is Cannon's Motion for a New Trial (ECF No. 105). Despite the Seventh Circuit's warnings about doing so, Cannon brought his ineffective assistance of counsel claim through a motion for a new trial. *See* Fed. R. Crim. P. 33.[1] For this reason, the Court granted Defendant's request for an evidentiary hearing to flesh out the allegations of ineffective assistance (ECF No. 116). After a handful of continuances, a hearing was held on April 11, 2023. Briefing has now concluded on the motion (ECF Nos. 159, 160, 161). Because the Court finds that counsel's alleged errors were not outcome determinative and substantial other evidence supported the jury's verdict, the Motion for New Trial will be DENIED.

## DISCUSSION

a. Legal Standard

Federal Rule of Criminal Procedure 33(a) permits the court to vacate any judgment and grant a defendant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision to grant a new trial is within the Court's discretion. *See United States v. Ervin*, 540 F.3d 623, 630 (7th Cir. 2008). In deciding whether to grant a new trial, the Court "may weigh evidence, evaluate credibility, and grant the motion if 'the substantial rights of the defendant have been jeopardized.'" *United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *reversed on other grounds*, 546 U.S. 12 (2005). Granting a new trial in the "interest of justice is reserved for only the most extreme cases,' and the Seventh Circuit 'approach[es] such motions with great caution and are wary of second-

---

[1] Usually, such claims are left for collateral review, *United States v. Simpson*, 864 F.3d 830, 834 (7th Cir. 2017). But "an ineffective assistance claim raised in a motion for new trial" is typically "addressed by holding an evidentiary hearing for the trial court to consider the evidence of the trial counsel's deficiency and its possible effect on the outcome." *United States v. Malone*, 484 F.3d 916, 919 (7th Cir. 2007).

2

guessing the determinations of both judge and jury." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1127 (2022) (internal citations omitted).

    b.  **Facts Presented at Trial**

The Government's case at trial relied mainly on the testimony of a confidential informant (CI), ATF agents, phone records, and surveillance evidence related to a transaction undertaken by the CI with Cannon. The CI, Andre Stribling, testified that he was a long-time associate of Jason Henderson (Henderson), the owner of Sune Studios in Lima, Ohio where Stribling had spent time. Through Henderson, Stribling met Cannon.

On May 24, 2016, Stribling was stopped by the Indiana State Police (ISP) for a seatbelt violation. (Trial Tr. Day 1, at 30). During that stop, ISP located a firearm after Stribling advised them it was in the vehicle. Stribling, a felon,[2] was arrested and taken to the ATF field office in Fort Wayne. Task Force Officer Caleb Anderson interviewed Stribling, and during that interview, Stribling agreed to cooperate with law enforcement by providing information he had about narcotics and firearms purchases. (*Id.* at 31-32).

On July 22, 2016, TFO Anderson met with Stribling. Stribling told TFO Anderson that he had purchased cocaine from an individual he knew as "Rex" on four to five occasions in the past two years. He also indicated that Rex also sold firearms and that both the firearms and drug sales occurred at Sune Studios in Lima, Ohio. Stribling provided TFO Anderson with the cell phone number for this individual, who Stribling had logged in his phone under the name "Rex." Stribling testified that he had known Rex since 2012 and would see him every couple of months. They had mutual friends and engaged socially with each other in addition to their drug transactions. Stribling was friends with Rex on Facebook and Instagram.

---

[2] Stribling served a three-year sentence in Ohio for felonious assault.

From July 23 through July 26, 2016, Rex, now known by Stribling as Cannon, contacted Stribling and offered to sell him two firearms and a small amount of cocaine. The Government introduced exhibits of the text conversations (Gov't Exs. 1, 2, 4, 5, and 6; Trial Tr. Day 1, at 35-46) between Stribling and Cannon as well as a recording of a phone call. (Gov.t Ex. 3). Cannon sent Stribling a text message photograph of a silver framed revolver with a black grip that he was selling. (Gov't Ex. 6). On July 25, 2016, Stribling spoke with Cannon by phone to arrange a controlled buy and identified Cannon's voice from a recording of that conversation. (Gov't Ex. 7). Stribling testified that the two were to meet on July 27, 2016, at a Taco Bell restaurant at U.S. 30 and Doyle Road. (Gov't Exs. 8, 10, and 11).

On July 27, 2016, Stribling reported to the ATF Office to meet with TFO Anderson and ATF Special Agent Sean Skender (SA Skender). A pre-buy search of Stribling was conducted, a recording device was placed on him, and he was provided with $700.00 to buy two firearms and an eight ball of cocaine from Cannon. (Trial Tr. Day 1 at 55-57). TFO Anderson rode with Stribling to a parking lot on Minnich Road where they met SA Skender, who had driven there separately. Stribling continued in his vehicle to the arranged location. Surveillance units were dispatched to monitor the transaction from different locations in the parking lot.

The Government played the audio of two calls between Stribling and Cannon just before their meeting. (Gov't Ex. 12, 13). Stribling testified that Cannon entered his vehicle and they completed the agreed upon exchange. (Trial Tr. Day 1, at 63-67). Cannon sat in the passenger's side of the Stribling's vehicle next to Stribling for around 3-7 minutes to complete the transaction. (*Id.*). The audio recording of this transaction was admitted as Gov'ts Ex. 14 and played for the jury.

After the transaction, a black car driven by a black female pulled next to Stribling's vehicle, Cannon exited Stribling's vehicle and entered the second vehicle. (Trial Tr. Day 1 at 72; Gov't Exs. 15, 16). When he was debriefed post-buy, Stribling confirmed that the individual he bought the firearms and drugs from was Cannon whom he knew as Rex. He also turned over the guns and drugs he purchased from Cannon. (Gov't Ex. 21)

Both SA Skender and TFO Anderson observed Cannon arrive at the location and enter Stribling's vehicle. TFO Anderson specifically identified Cannon and testified that Cannon was dropped off from a dark colored vehicle on Doyle Road some distance from the meet location and so he had the opportunity to take photos of Cannon as he approached Stribling's vehicle. These photos were admitted at trial. Additionally, TFO Anderson testified that he was familiar with Cannon's voice and he confirmed that Cannon and Stribling were the two people conversing during the audio recording of the transaction.

On the third day of trial, the defense called Terry. (Trial Tr. Day 3 at 72). Essentially, the defense theory of the case was that Terry, not Cannon, was texting Stribling and Terry conducted the July 27, 2016, transaction. Or at least that is what everyone thought was supposed to happen. *See* Gov't Remarks Trial Tr. Day 3 at 116 ("I was under the impression from [defense counsel] and his witness list that [Terry] was just going to come in here and, you know, admit to three felony offenses and then I would just deal with him on cross-examination.") Terry testified that multiple individuals had access to the business phone at Sune Studios. When asked if he was the individual texting Stribling on July 22 and 25, 2016, Terry repeatedly asserted his Fifth Amendment rights. Defense counsel, frustrated by these developments, engaged in a line of questioning implying to the jury that during pretrial discussions Terry told defense counsel he wasn't going to assert his Fifth Amendment rights. The Government objected, the Court sustained the objection and

5

instructed the jury to disregard the questions. Counsel persisted and asked Terry if he recalled selling two guns and drugs to Stribling on July 27, 2016. Terry again asserted his Fifth Amendment rights and the Court again struck the question.

Ultimately, the Court denied the Government's motion for a mistrial and allowed the case to proceed to the jury. Cannon was convicted on all counts.

### c. Evidentiary Hearing

After Cannon moved for a new trial, the Court conducted an evidentiary hearing as to his assertions of counsel's ineffectiveness. During that hearing, new defense counsel called as witnesses: Terry, Attorney David Joley (Atty Joley), who represented Cannon at trial, SA Skender, and Attorney Patrick Arata to provide expert testimony. (Evid. Hr'g Tr., ECF No. 156).

Terry testified that he first spoke with Atty Joley around a week before Cannon's trial. Terry testified that the meeting was by phone and lasted 20-30 minutes. The two discussed his testimony and Atty Joley asked him if he was the one who sold the drugs and guns to Stribling:

> Q. … Mr. Joley asked you if you would be willing to say that you sold the weapon and the drugs?
> A. Yes.
> Q. All right. How did you respond?
> A. Well, like I said, it was just like a lot of talk, but first I initially said Well, it's a possibility. And then in the same breath, I said, You know what, anything incriminating you asking me, I'm going to plead the Fifth on. And we just left it at that.

(Evid. Hr'g Tr. at 7-9). Terry stated that Atty Joley did not advise him to retain counsel and Terry understood that Atty Joley did not represent him. Terry testified that the two spoke again on the third day of trial right before Atty Joley called him to testify. His recollection of that conversation is below.

> A. He asked me again what was I going to do when I took the stand. Again, I told him I'm going to plead the Fifth. He told me if I did say it was me, that there was a detective in the courtroom that would take me to jail, possibly if I said I did it.

6

> Basically, that's all we talked about it, and he just let me [know] there was an Ohio Detective in the courtroom, I possibly could go to jail if I say I did it, and that was it.

(Evid. Hr'g Tr. at 12).

Atty Joley testified next and discussed the defense trial strategy and the investigation he conducted as part of the defense. He sent an investigator to Sune Studios to talk with Henderson and his brother. At trial, Atty Joley elicited testimony from Henderson that a phone was "lying around" Sune Studios and that anyone could have used it. The reason for this testimony was to cast doubt on whether someone other than Cannon was texting with Stribling. When questioned whether he went to the scene of the transaction, took photos of the area, examined the firearm, or obtained national weather service reports for July 27, 2016, Atty Joley testified he did not. But the Government elicited from Atty Joley on cross-examination that the defense did not dispute that the transaction occurred. Their defense was that Cannon was not involved in it.

As for Terry's trial testimony, Atty Joley confirmed that after Cannon told him that he wanted his brother to testify, he contacted Terry.

> Q: Based upon what your client, Timothy Cannon, had told you, did you believe that Terry Cannon was to be the most important witness of the trial?
>
> A. Based upon what my client told me do I believe Terry — yes, absolutely
>
> ….
>
> Q. When you interviewed him, did you expect that Terry [] would say that he committed the crime of selling the weapon and the drugs to Andre Stribling?
>
> A. I honestly didn't know what to expect…
>
> A. …    I guess, to say the least, I was shocked by the information that my client gave me. So I didn't know what to expect.

> Q. Well, what came out of the phone interview?
>
> A. … He said that he would -- I walked him through, okay, this is what -- the information that I have. My client's telling me that it was you who did this transaction. I asked him what the cell phone number was that was used, and I believe he was able to tell me that. I asked him, you know, told him basically they're going to look into your background, so were you – we're not going to find out that you were in prison at that time or anything like that? He said No, he was not in prison during that time. And he said, when I asked him about the specifics of the transaction, he gave me information that I thought validated what my client told me.
>
> Q. Well, what information did he give?
>
> A. I believe he said -- I believe I specifically asked him, So you were the person who did this, and I believe his answer was yes.
>
> Q. So you didn't ask him the weight of the drugs, you haven't brought that up, and you didn't ask him the make and model of the pistol that was sold, correct?
>
> A. No, I don't believe I did ask him the specific questions. I know I did ask him about the person that was driving the vehicle, the vehicle that was registered to, and he gave me information about that person that coincided with the information that was in the reports.
>
> Q. Did you advise him that he needed a lawyer?
>
> A. I think I did. I did not advise him, I don't believe, he needed a lawyer, but one of the first things I asked him was, Do you have a lawyer, have you spoken to a lawyer. And I do believe I asked him, do you understand this very well -- excuse me -- you could be incriminating yourself by coming in and doing this. So I do believe probably one of the first things I asked him was whether or not he did have an attorney. I think I need to ask somebody if they have an attorney to interview them for certain.

On cross-examination, the Government introduced Atty Joley's notes from his conversations with Terry. Those notes confirmed that Terry told Atty Joley that he was the one who took part in the transaction with Stribling. (Evid. Hr'g Gov't Exs. 6, 9). Atty Joley also testified that Terry never told him he intended to plead the Fifth Amendment if called as a witness:

8

> Q. And during the conversation with Terry Cannon on April the 28th of 2022, did Terry Cannon at any point tell you that he intended to invoke his Fifth Amendment right if he were called as a witness in the trial against his brother, Timothy Cannon?
>
> A. No, not that I recall, at all.

(Evid. Hr'g at 66). Even when Atty Joley walked Terry through the questions he planned to ask him right before he testified, Atty Joley testified that Terry did not intend to assert his Fifth Amendment right. (*Id.* at 75-76).

At the hearing, Cannon also elicited expert testimony from Atty Patrick Arata (Atty Arata) in the area of criminal defense and trial advocacy. Atty Arata testified that he reviewed portions of the trial transcript and, in his opinion, Atty Joley erred by promising the jury during opening statements that Terry would fess up to the crimes charged against Cannon. (Evid. Hr'g at 120-122). He concluded that Atty Joley's failure to deliver on that opening promise was "outcome determinative". (*Id.*)

   d. Analysis

Cannon requests a new trial based on violation of his Sixth Amendment right to effective assistance of counsel. The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for [his] defence." U.S. Const. amend. VI. This right to assistance of counsel encompasses the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970); *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009). A party claiming ineffective assistance of counsel bears the burden of showing (1) that his trial counsel's performance fell below objective standards for reasonably effective representation and (2) that this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984); *Groves v. United States*, 755 F.3d 588,

591 (7th Cir. 2014); *United States v. Jones*, 635 F.3d 909, 915 (7th Cir. 2011); *Wyatt v. United States*, 574 F.3d 455, 457 (7th Cir. 2009).

To satisfy the first prong, Cannon must first "show that counsel provided constitutionally deficient performance, meaning counsel made errors so serious he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Winfield v. Dorethy*, 956 F.3d 442, 451 (7th Cir. 2020) (internal quotations omitted). In evaluating such claims, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. To satisfy the second prong, Cannon also must "show that this deficient performance prejudiced his defense—meaning there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Winfield*, 956 F.3d at 451 (quoting *Strickland*, 466 U.S. at 694).

Cannon asserts several areas that he contends show ineffective assistance by Atty Joley. First, he asserts that it was error for Atty Joley to promise the jury in opening statements that Terry would specifically testify that he committed the crimes for which Cannon was indicted. Going one step further, Cannon argues Atty Joley should not have called Terry as a witness at all. Next, he argues that Atty Joley failed to conduct an adequate investigation into the facts and failed to develop the defense through other witnesses at trial.

*Strickland* directs courts to have a highly deferential view on trial counsel. "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. *Strickland* does not require perfect performance by defense counsel; it requires only competence. *Harrington v. Richter*, 562 U.S. 86, 110 (2011). Mindful of this Court's deferential review, the

10

Court finds Cannon has not on this record established counsel's performance fell below an objective standard of reasonableness.

Cannon argues, supported by his expert's testimony, that Atty Joley's promise to the jury that he would produce "the guy" who really committed the crime was not only ineffective but also "outcome determinative" when he didn't follow through on eliciting that promised testimony. Insofar as Cannon faults his defense counsel for referencing Terry's anticipated testimony in his opening, when Terry ultimately did not testify in conformity with counsel's prediction, the Court identifies no ineffectiveness.

Counsel's opening statement was integral to the defense's trial strategy to convince the jury that Terry, not Cannon, was the culpable party. Defense counsel introduced the idea that Terry was the actual culprit in the opening statement and reinforced it throughout trial, including during cross-examination of the Government's witnesses and in his closing argument. The Court finds credible Atty Joley's testimony at the evidentiary hearing that he believed Terry would admit to the conduct. Unlike Terry, who the Court observed and firmly believes was disingenuous in both his dealings with Atty Joley and under oath before the Court (and perhaps even acting in cahoots with Cannon by trying to commit fraud upon the Court), Atty Joley testified believably that he talked with Terry right before he testified and was unaware Terry would refuse to answer questions about his alleged involvement in the transaction with Stribling. Given this belief, his client's urging to have his brother testify, and the overall trial plan to provide the jury with another suspect, this was a reasonable trial strategy – whether Terry testified and admitted to the conduct or didn't testify at all. Indeed, it may have been the only strategy available to Cannon, in light of the strong direct evidence of Cannon's participation in the crimes.

11

Nor is it lost on the Court that in any opening statement, there is a risk that anticipated evidence will not materialize or materialize in a way that the parties do not appreciate at the time they make the statement. While in hindsight Atty Joley's judgment may be vulnerable to criticism, his reasons for proceeding as he did were well-founded and his failure to "deliver" on the "promise" made in his opening statement did not result from incompetence, lack of preparation or inattention. Indeed, Atty Joley could not have known when he made the remarks in his opening statement that Terry would testify as he did.

Cannon has also failed to convince the Court that Atty Joley failed to properly investigate the facts, interview witnesses or otherwise prepare for trial. Cannon asserts that Atty Joley did not interview SA Skender or TFO Anderson, didn't personally interview Henderson, did not go to the scene and photograph it and did not inspect the two firearms involved in the case.

A criminal defendant's trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. But a decision not to investigate a potential witness or other facts "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Id.*

There was no indication during trial that Atty Joley did not know the facts of the case or was unprepared for trial. Admittedly, at times Atty Joley bumbled in front of the jury but not to a point of incompetence. He conducted appropriate cross-examination of the Government's witnesses, presented a cogent theory of defense, and made many evidentiary objections. But again, the critical factor here is Cannon's defense theory. The "it wasn't me" defense was not thought up or presented to the jury out of thin air. Indeed, earlier in the case Atty Joley moved to suppress the identification evidence based on what he asserted was a faulty or suggestive identification of his

12

client by Stribling. While he didn't prevail on his motion, it was clear to the Court and the Government that the defense theory of the case was that Cannon wasn't the right guy. At no point was Cannon's defense that no drug/gun transaction occurred. Thus, many facts that Cannon harps on in his motion and believes should have been investigated were irrelevant to the presentation of that defense. *See United States v. Brown*, 2011 WL 4835846, at *4 (E.D. Pa. Oct. 12, 2011) (quoting *Strickland*, 466 U.S. at 690–91) ("[t]he decision of whether to interview and call a particular witness is generally a strategic choice made by counsel and is entitled to a 'heavy measure of deference.'").

Equally important, Cannon does not identify how conducting any of the investigation he suggests would have produced favorable evidence for him or assisted in his defense. *United States v. Hicks*, 2023 WL 8433954, at *6 (N.D. Ill. Dec. 5, 2023) ("Nor does Hicks develop his 'pre-trial investigation' argument by either identifying specific information that should have been used by counsel or discussing how such information would have affected the outcome of the case."). A defendant alleging ineffective assistance of counsel based on failure to investigate must present "a comprehensive showing as to what the investigation would have produced." *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003). Other than pointing out what he thinks should have been done, Cannon produces no "comprehensive showing" of what those investigations might have revealed. Thus, the Court does not find that Atty Joley was ineffective based on his lack of pretrial investigation.

At this point, then, the Court is left with no finding that counsel was ineffective under the first prong of *Strickland*. But even if the Court is wrong, there is little in the record to support the second prong – that the alleged deficiencies of counsel taken together so prejudiced the record that the result of the proceeding would have been different. *See Goodman v. Bertrand*, 467 F.3d 1022,

13

1030 (7th Cir. 2006) ("Rather than evaluating each error in isolation ... the pattern of counsel's deficiencies must be considered in their totality."); *Strickland*, 466 U.S. at 687, 694.

Cannon tries to establish prejudice with Atty Arata's testimony that, in his opinion, the errors of counsel were outcome determinative and outside the wide range of professional reasonableness afforded defense counsel. The Court respectfully disagrees given the specific facts here. The Government presented overwhelming testimony from three credible witnesses that Cannon was the person involved in the transaction with Stribling. Stribling testified that he was in a car with Cannon for more than five minutes conducting the transaction. Both agents testified that they observed Cannon at the July 27, 2016, transaction, they identified his voice on the audio recordings and photographed him there. Cannon's "it wasn't me" defense would have struggled even without Atty Joley's reference to Terry's anticipated testimony during opening statements. Given the other evidence in the record, the Court finds there is no reasonable probability the results of the trial would have been different even considering all Cannon's complaints about Atty Joley.

In sum, the Court concludes that the substantial rights of Cannon have not been jeopardized by constitutionally deficient representation. Cannon's Motion for New Trial (ECF No. 105) is DENIED.[3]

## CONCLUSION

Cannon's Motion for a New Trial (ECF No. 105) is DENIED. Cannon's request for release pending sentencing (ECF No. 126) is also DENIED. A sentencing scheduling order will be entered by a separate order.

SO ORDERED on December 13, 2023.

---

[3] The Court also kept under advisement Cannon's request for release pending sentencing. (ECF No. 126). That motion is DENIED.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT
